TRIANGLE PUBLICATIONS, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4169–67. Filed February 5, 1970.

*Jules I. Whitman* and *Peter J. Picotte II*, for the petitioner.
*Albert J. O'Connor*, for the respondent.

OPINION

The first issue presented for decision is whether petitioner is entitled to deduct as amortization or otherwise the amount of its subsidiary's cost of purchase from an unrelated party of a TV Guide franchise from petitioner which the subsidiary had not recovered through amortization deductions at the time petitioner liquidated its subsidiary and took over its subsidiary's assets and liabilities. Petitioner contends it is entitled to amortize the unrecovered cost of the franchise to its subsidiary as the cost of an intangible asset with a limited life used in

its trade or business under section 1.167(a)-3, Income Tax Regs.[5] Under section 167 and the regulations promulgated pursuant thereto, a contract which has a limited life and is utilized in the business of a taxpayer may be amortized ratably over its useful life. See *David Hoffman*, 48 T.C. 176 (1967). A franchise may be a contract with a limited useful life. *Pasadena City Lines, Inc.*, 23 T.C. 34, 38 (1954).

Petitioner's position is that the franchise acquired by its subsidiary had a useful life of 5 years to the subsidiary and that when it acquired the assets and liabilities of its subsidiary one of the assets it acquired was the remaining year and 8 months of the franchise.

Although respondent's position is not completely clear he apparently first contends that when petitioner's subsidiary acquired the franchise from the unrelated party in May of 1956 the life of the franchise was indefinite and therefore the asset petitioner acquired in the liquidation was a franchise with an indefinite useful life. In the alternative respondent contends that if the franchise did not have an indefinite useful life it had a useful life of only 3 years. Respondent makes a second contention that since the franchise was from petitioner to the subsidiary, even if it had a useful life of 5 years to petitioner's subsidiary, it ceased to exist when petitioner acquired the assets of its subsidiary as petitioner could not have an asset of a franchise from itself.

Respondent argues that the franchise contract which petitioner's subsidiary S.R.B.T.V. acquired from Tele Views had an indefinite life and that the exchange of letters between petitioner and S.R.B. T.V. limiting the life of the contract unconditionally to 5 years was not an arms'-length transaction. The contract between petitioner and Tele Views did provide for automatic extensions provided no notice of the intention of either party to terminate was given as specified in the contract. However, prior to the acquisition of the franchise by S.R.B.T.V., the life of the franchise had been unconditionally limited to 5 years unless we agree with respondent that the agreement between petitioner and S.R.B.T.V. should be considered of no validity for the purpose of this case. Where a contract is renewable as a matter of course it generally will be considered to have an indefinite life and therefore not to be an asset subject to amortization under section 167. It is therefore necessary for us to determine

---

[5] Sec. 1.167(a)-3, Income Tax Regs. Intangibles.

If an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance. Examples are patents and copyrights. An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation. No allowance will be permitted merely because, in the unsupported opinion of the taxpayer, the intangible asset has a limited useful life. * * *

whether the agreement between petitioner and S.R.B.T.V. was a bona fide agreement limiting the life of the franchise unconditionally to 5 years. On the basis of the evidence in this case we consider the agreement between petitioner and S.R.B.T.V. to be bona fide.

The letter agreement between petitioner and S.R.B.T.V. to extend the term of the franchise for a single 5-year period was entered into before S.R.B.T.V. acquired the franchise from Tele Views. The limitation of the franchise to a definite life was in line with action being taken by petitioner in dealing with unrelated parties. S.R.B.T.V. was not liquidated until more than 3 years after it had acquired the franchise. On the basis of all the evidence of record we conclude that the franchise with respect to TV Guide which S.R.B.T.V. acquired from Tele Views as modified by the letter agreement between petitioner and S.R.B.T.V. had a definite life of 5 years from the date it was acquired by S.R.B.T.V. and we have so found. Our holding in this respect also disposes of respondent's contention that the life of the franchise which S.R.B.T.V. acquired in May 1956 was only 3 years.

Having concluded that the franchise which S.R.B.T.V. acquired from Tele Views had a determinable useful life of 5 years from the date of its acquisition by S.R.B.T.V. we must determine whether this franchise was an asset with a remaining determinable useful life of approximately a year and 8 months when petitioner acquired all of the assets of S.R.B.T.V. upon liquidation of that corporation. Respondent argues that since the franchise owned by S.R.B.T.V. was granted by petitioner, when petitioner acquired the assets of S.R.B.T.V. the franchise ceased to exist.

The effect of the merger of two interests upon the life of an intangible asset has been considered by us in other situations. We have held that where two interests are merged through purchase, the unrecovered cost of the intangible asset is recovered by the purchaser through amortization. See *William N. Fry, Jr.*, 31 T.C. 522 (1958), affirmed per curiam 283 F. 2d 869 (C.A. 6, 1960), involving merger of a life estate with remainder interests in a trust which cites and relies on *Bell* v. *Harrison*, 212 F. 2d 253 (C.A. 7, 1954), involving merger of life estate and remainder interests and *Peter P. Risko*, 26 T.C. 485 (1956), involving purchase by one partner of another partner's limited as to time interest. See also *Trustee Corporation*, 42 T.C. 482, 488 (1964), involving payment by a lessor to a lessee for cancellation of a lease. In our view the franchise of limited duration owned by petitioner's wholly owned subsidiary when acquired by petitioner falls within the ambit of these cases. On the basis of these cases we sustain petitioner's claimed deduction for amortization of the franchise acquired upon liquidation of S.R.B.T.V. over its remaining useful life to S.R.B.T.V.

The second issue concerns the deductibility by petitioner of the amount paid to acquire the stock of one of its franchisees to the extent the payment exceeded the asset value of the franchisee. Petitioner had served notice of termination of the franchise but while still engaged in negotiations relating to a renewal of the franchise agreement purchased the stock of the franchisee. Immediately after acquiring this stock, petitioner liquidated the franchisee and disposed of the assets of that corporation. The evidence is clear that petitioner acquired the stock of its franchisee solely for the purpose of terminating the franchise without having difficulties arise with respect to its subscription distribution and having the stockholders of the franchisee compete with it or otherwise interfere with the maintenance of the level of distribution of TV Guide then existing in the area. The franchise that existed at the time petitioner liquidated the franchisee after acquiring its stock had only 2½ months to run. The value of the remaining term of this franchise was $55,000 and in accordance with our holding on the first issue this amount is properly amortizable over the period ending December 31, 1961, when that franchise expired.

The facts here show that no franchise extending beyond December 31, 1961, existed at the time petitioner purchased the stock of T.N.I. The abortive negotiations between the parties relating to the granting of a 3-year franchise did not result in a contract between the parties. It is also clear that petitioner purchased the stock of T.N.I. only for the purpose of acquiring the assets of T.N.I. and with intent to liquidate the corporation promptly. Although petitioner on its books allocated the total payment in excess of T.N.I.'s asset value to the acquisition of the T.N.I. franchise on the facts here present we hold that to the extent this amount exceeded the $55,000 value of the existing franchise it was paid to insure for petitioner unhampered use of the customer lists held by T.N.I. in order to insure an orderly transition in distribution at the time of the termination of the franchise including freedom from competition or unfavorable interference by the T.N.I. stockholders. There was no allocation of the purchase price between the agreement not to compete and the other tangible assets purchased. Where a composite price is paid for a covenant not to compete and other intanglible assets no allocation of a part of the purchase price is made to the covenant if such covenant has no significance beyond insuring the effective transfer of the other intangibles. See *Levine* v. *Commissioner*, 324 F. 2d 298, 300 (C.A. 3, 1963), affirming a Memorandum Opinion of this Court. On the basis of the evidence in this case we find that the unhampered use of the customer lists and of the distribution of TV Guide in the Pittsburgh area was the significant asset petitioner was purchasing.

The covenant not to compete contained in the purchase contract was merely further assurance of such orderly transition. There was a separate agreement with Adler which involved consulting services and a covenant not to compete for a 5-year period. This covenant of Adler's was undoubtedly very significant to petitioner. However, this separate agreement carried its own consideration and no part of the sales price of the stock is allocable to this agreement. In our view the portion of the excess of the cost to petitioner of the stock over the purchased company's asset value which we have allocated to the acquisition of the customer lists in order to insure an orderly transition of distribution is an amount paid for a capital asset with no reasonably ascertainable useful life and is not deductible by petitioner unless, as it contends, this expenditure comes within the provisions of section 173.[6] Section 173 specifically allows deduction of expenditures made to establish, maintain, or increase the circulation of a newspaper, magazine, or other periodical other than those for the purchase of depreciable property or the acquisition of circulation through the purchase of any part of the business of another publisher. It is clear from the reference in section 173 to section 263 that any expenditure made to increase or maintain circulation other than those specifically excepted are deductible even though they would otherwise be considered capital expenditures. Therefore, expenditures made for the purchase of customer lists, although normally non-depreciable capital expenditures where made to establish, maintain, or increase circulation of a periodical are deductible. However, expenditures made to acquire circulation through the purchase of any part of the business of another publisher are not deductible under section 173. From the evidence here it appears that petitioner's expenditure was to maintain its circulation and not to "acquire" circulation. The circulation involved in the transaction was of petitioner's magazine TV Guide. However, we need not decide whether this fact would cause the expenditure to be deductible in all events, since in our view T.N.I. was not "another publisher" within the meaning of section 173.

---

[6] SEC. 173. CIRCULATION EXPENDITURES.

Notwithstanding section 263, all expenditures (other than expenditures for the purchase of land or depreciable property or for the acquisition of circulation through the purchase of any part of the business of another publisher of a newspaper, magazine, or other periodical) to establish, maintain, or increase the circulation of a newspaper, magazine, or other periodical shall be allowed as a deduction; except that the deduction shall not be allowed with respect to the portion of such expenditures as, under regulations prescribed by the Secretary or his delegate, is chargeable to capital account if the taxpayer elects, in accordance with such regulations, to treat such portion as so chargeable. Such election, if made, must be for the total amount of such portion of the expenditures which is so chargeable to capital account, and shall be binding for all subsequent taxable years unless, upon application by the taxpayer, the Secretary or his delegate permits a revocation of such election subject to such conditions as he deems necessary.

Section 173 was enacted into law as section 23(bb) of the Internal Revenue Code of 1939 by the Revenue Act of 1950. The purpose of the section was to remove the distinction made by prior case law between expenditures to maintain circulation and expenditures to establish or increase circulation. See S. Rept. No. 2375, 81st Cong., 2d Sess., 1950-2 C.B. 529; H. Rept. No. 3124, 81st Cong., 2d Sess., 1950-2 C.B. 583. The original bill provided that a deduction would not be allowed for any part of expenditures for the acquisition of circulation "through the purchase of newspapers, magazines, or other periodicals." See S. Rept. No. 2375, 81st Cong., 2d Sess. 1950-2 C.B. 539. This language was changed in the 1954 Code to the present wording by an amendment in the Senate. However, Congress intended to carry over the substance of section 23(bb) of the 1939 Code into section 173, I.R.C. 1954. S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. No. 591), 83d Cong., 2d Sess., p. 13 (1954).

We have found no legislative history of section 173 which clarifies the term "publisher," nor have we found any cases determining who shall be deemed to be a publisher within the meaning of section 173. We will, therefore, consider whether T.N.I. should be classed as a "publisher" under section 173 by reference to the nature of its activities.

T.N.I. performed several functions as franchisee of petitioner. It arranged for local distribution of TV Guide through subscription mailing, and retail sales at newsstands and other appropriate points of distribution, such as supermarkets. It arranged to have the center section of the magazine printed, combining the information received from petitioner with a small amount of content (about 10 percent) which it acquired and which dealt solely with local programing and advertising, using a format prescribed by the national office of petitioner. It then combined the center section with material printed and forwarded by petitioner to form one magazine which was placed in distribution in the manner above set forth. T.N.I. had no participation in format, content (except in a minor sense), or editorial decisions with respect to TV Guide. In short, T.N.I. took no part in the fundamental aspects of the creation of the product sold. Although T.N.I. did contract for the actual printing of a portion of the final product, it could not vary the product in any substantial manner, for petitioner retained all power of decision over the format, content, and editorial statement of the magazine. In fulfilling its functions T.N.I. more closely resembles a distributor than it does a creator. Petitioner, not T.N.I., drew together the diverse elements of authorship, financing, editing, advertising, reporting, printing, and distribution which are required in the creation of a magazine. Although the line is not distinct because of T.N.I.'s efforts in sale of local advertising and reporting of local listings, we find on the basis of all evidence of record that

T.N.I. is not a publisher within the meaning of section 173. Therefore, the expenditures made by petitioner except to the extent allocable to the remaining 2 months of the T.N.I. franchise are deductible under section 173 since these expenditures were not made in the acquisition of any part of the business of another publisher.

The last question presented is whether petitioner's use of guideline lives under Rev. Proc. 62–21 for the purpose of computing depreciation prohibits it from utilizing with respect to the same assets a different useful life under section 48(c)(2) in computing its investment credit.

Section 46 provides that the amount of credit allowed by section 38 shall be equal to 7 percent of the qualified investment, which is defined as the aggregate of the applicable percentages of cost of new section 38 property. To determine the applicable percentage, section 46(c)(2)[7] sets forth a table utilizing the term "useful life" without definition. Section 1.46–3(e), Income Tax Regs.,[8] provides that estimated useful lives "may be determined at the taxpayer's option under either subparagraph 2 or 3 of this paragraph." That consistency between the useful life of an asset for depreciation and for investment credit is not uniformly required by respondent's regulations is shown by the provision of section 1.46–3(c) that a taxpayer may assign to each asset falling within a guideline class the class life of the taxpayer

---

[7] SEC. 46(c). QUALIFIED INVESTMENT.—

(2) APPLICABLE PERCENTAGE.—For purposes of paragraph (1), the applicable percentage for any property shall be determined under the following table:

| If the useful life is— | The applicable percentage is— |
| --- | --- |
| 4 years or more but less than 6 years | 33⅓ |
| 6 years or more but less than 8 years | 66⅔ |
| 8 years or more | 100 |

For purposes of this paragraph, the useful life of any property shall be determined as of the time such property is placed in service by the taxpayer.

[8] Income Tax Regs., sec. 1.46–3(e) *Estimated useful life.*—(1) *In general.* With respect to assets placed in service by the taxpayer during any taxable year, for the purpose of computing qualified investment the estimated useful lives assigned to all assets which fall within a particular guideline class (within the meaning of Revenue Procedure 62–21) may be determined at the taxpayer's option, under either subparagraph (2) or (3) of this paragraph. Thus, the taxpayer may assign estimated useful lives to all the assets falling in one guideline class in accordance with subparagraph (2) of this paragraph, and may assign estimated useful lives to all the assets falling within another guideline class in accordance with subparagraph (3) of this paragraph. See subparagraphs (4) and (5) of this paragraph for determination of estimated useful lives of assets not subject to subparagraph (2) or (3) of this paragraph.

(2) *Class life system.* The taxpayer may assign to each asset falling within a guideline class, which is placed in service during the taxable year, the class life of the taxpayer for the guideline class for such year as determined under section 4, Part II of Revenue Procedure 62–21. * * *

(3) *Individual useful life system.* (1) The taxpayer may assign an individual estimated useful life to each asset falling within a guideline class which is placed in service during the taxable year. * * *

for the guideline class for each year as determined under Rev. Proc. 62–21, 1962–2 C.B. 418, without the requirement that the taxpayer utilize the guideline method for the purposes of computing depreciation. If such consistency were required a taxpayer would be permitted to use class life for investment credit computation only if he had used it in computing depreciation.

Respondent argues that the word "may" found in section 1.46–3(e), should be read as "must" thereby requiring a taxpayer who has used useful life based on the guideline life set forth in Rev. Proc. 62–21 to use the same life for the purpose of computing his investment credit even though that estimated useful life is not accurate for the taxpayer's particular situation. Respondent's interpretation would result in a taxpayer who purchased assets with a useful life in excess of that provided by the guidelines for that class of asset never receiving a portion of the investment credit to which he would be entitled on the basis of the actual useful life of the asset. If a taxpayer either by use of the guidelines or otherwise computes a larger investment credit than that to which he is entitled by utilizing an erroneously long estimated useful life, such excess is subject to recapture upon retirement of the asset.

A taxpayer ultimately recovers his entire investment in an asset through depreciation even though he may recover his investment over a period less than the useful life of the asset if he uses an erroneously short useful life.

Considering these factors as well as the normal meaning of the word "may" we conclude that petitioner is entitled to compute its investment credit for the year 1962 on the basis of the actually demonstrated useful life of the assets it acquired in that year.

Whether a taxpayer should be entitled to use, in computing depreciation, the shorter useful life of an asset prescribed by the guidelines in Rev. Proc. 62–21 when he has demonstrated an actually longer useful life in computing his investment credit is not an issue before us in this case.

In the instant case the evidence shows that the reasonable estimated useful life of the technical equipment which petitioner acquired in 1962 is in excess of 8 years. We interpret respondent's regulations to permit petitioner to use either the guideline class life set forth in Rev. Proc. 62–21 or to use the reasonable estimated useful life of the asset. Since the estimated useful life claimed by petitioner is reasonable, we sustain petitioner's computation of its investment credit.

*Decision will be entered under Rule 50.*