ITHACA INDUSTRIES, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 7076-89.          Filed August 12, 1991.

*David M. Ivey, Patrick G. Jones, Alison M. Drummond, William A. Turner, Phillip A. Bradley,* and *Kendall L. Houghton,* for the petitioner.

*Gary F. Walker, David R. Reid,* and *Albert L. Sandlin, Jr.,* for the respondent.

SCOTT, *Judge:* Respondent determined deficiencies in petitioner's corporate income tax for its fiscal years ending

February 3, 1984, and February 1, 1985, in the amounts of $404,290 and $572,775, respectively. The issues for decision are: (1) Whether an assembled work force is an intangible asset distinct from goodwill or going-concern value with an ascertainable useful life over which the value of the asset may be amortizable; (2) whether raw material supply contracts are assets distinct from goodwill or going-concern value with an ascertainable useful life over which the value of the asset may be amortizable; and (3) if either the work force in place or the raw material contracts has a value apart from goodwill or going-concern value and an ascertainable useful life, what is the useful life and proper value allocable to each such asset?[1]

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect for the years in issue.

Petitioner in its brief states that "petitioner acquired old Ithaca in a statutory merger that was treated by petitioner as a purchase of Old Ithaca stock and a liquidation under Internal Revenue Code (Code) section 334(b)(2) as then in effect." Sec. 334 as generally applicable for the years 1983, 1984, and 1985 provides:

SEC. 334. BASIS OF PROPERTY RECEIVED IN LIQUIDATIONS.

(a) GENERAL RULE.—If property is received in a distribution in complete liquidation (other than a distribution to which section 333 applies), and if gain or loss is recognized on receipt of such property, then the basis of the property in the hands of the distributee shall be the fair market value of such property at the time of the distribution.

(b) LIQUIDATION OF SUBSIDIARY.—

(1) DISTRIBUTION IN COMPLETE LIQUIDATION.—If property is received by a corporation in a distribution in a complete liquidation to which section 332(a) applies, the basis of the property in the hands of the distributee shall be the same as it would be in the hands of the transferor.

(2) TRANSFERS TO WHICH SECTION 332(C) APPLIES.—If property is received by a corporation in a transfer to which section 332(c) applies, the basis of the property in the hands of the transferee shall be the same as it would be in the hands of the transferor.

(3) DISTRIBUTEE DEFINED.—For purposes of this subsection, the term "distributee" means only the corporation which meets the 80-percent stock ownership requirements specified in section 332(b).

(c) PROPERTY RECEIVED IN LIQUIDATION UNDER SECTION 333.—If—

(1) property was acquired by a shareholder in the liquidation of a corporation in cancellation or redemption of stock, and

(2) with respect to such acquisition—

(A) gain was realized, but

(B) as the result of an election made by the shareholder under section 333, the extent to which gain was recognized was determined under section 333,

then the basis shall be the same as the basis of such stock cancelled or redeemed in the liquidation, decreased in the amount of any money received by the shareholder, and increased in the amount of gain recognized to him.

The effective date of sec. 334 as set forth above is generally Aug. 31, 1982. However, there are numerous exceptions to the effective date of Aug. 31, 1982, for dissolutions planned prior to Aug. 31, 1982, and for situations where a ruling had been obtained prior to that date.

In any event, respondent has not questioned the fact that petitioner is entitled to allocate the amount paid for the stock of Old Ithaca among the assets of Old Ithaca which it received. The only determination made in the notice of deficiency issued to petitioner in this case is that an assembled work force and certain supply contracts are not assets separate from goodwill or going-concern value to which an amount of the purchase price of the stock may be properly

## FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

On the date of filing its petition, petitioner was a Delaware corporation with its principal place of business in Wilkesboro, North Carolina. It timely filed U.S. corporation income tax returns for its fiscal years ending February 3, 1984, and February 1, 1985, with the Internal Revenue Service Center at Memphis, Tennessee. Petitioner keeps its books and files its Federal income tax returns on an accrual basis.

Ithaca Industries, Inc. (Old Ithaca), was formed in 1948 by George Abbott (Mr. Abbott), as a manufacturer of women's intimate apparel. In 1982 Mr. Abbott was the majority stockholder, owning approximately 70 percent of the stock. The other stockholders at that time were Gregory B. Abbott, G. Christopher Abbott, and Nicholas Wehrmann. By 1982 Old Ithaca had become the largest private label manufacturer of women's sheer hosiery and underwear in the United States. It was also a major producer of men's and boys' private label underwear.

Sometime around 1983, Mr. Abbott decided to retire from active involvement in the corporation. At that time, Old Ithaca was a client of Merrill Lynch Capital Markets (Merrill Lynch CM). Representatives of Merrill Lynch CM suggested to Mr. Abbott a public offering of Old Ithaca stock in order to provide liquidity to the shareholders, in particular to Mr. Abbott. Because of the length of time required to complete a public offering, the shareholders of Old Ithaca considered other options, including a sale of their entire interest in the corporation.

The Abbott family then discussed with representatives of Merrill Lynch Capital Partners, Inc. (Merrill Lynch CP), the possibility of a leveraged buyout. The representatives of Merrill Lynch CP considered Old Ithaca a very attractive investment due to its stability, management, position in the marketplace, and good relations with customers. The primary purpose of a leveraged buyout would be to provide

---

allocated. The facts surrounding the merger are not shown in this record in complete enough form to determine which section of the Code is applicable.

liquidity to Mr. Abbott with respect to his interest in Old Ithaca.

Petitioner was incorporated by Merrill Lynch, Pierce, Fenner & Smith, Inc. (Merrill Lynch) on September 22, 1983, as New Ithaca Corp. (New Ithaca) for the purpose of acquiring the assets and business of Old Ithaca. New Ithaca offered the shareholders of Old Ithaca $110 million consisting of $5,432,432.43 of junior subordinated notes and the balance in cash, in exchange for all common stock of Old Ithaca. The offering price was determined by Merrill Lynch from industry comparables, preliminary discussions regarding the public offering, imputed values from financial projections, and the need to balance the sales price against the ability to finance the sale. The Abbott family considered the price and concluded that it was attractive to them. The purchase price reflected the fair market value of Old Ithaca.

On October 28, 1983 (day of the merger or merger date), New Ithaca purchased the stock of Old Ithaca and then liquidated Old Ithaca. Following the liquidation, New Ithaca changed its name to Ithaca Industries, Inc. (Ithaca). As of November 11, 1983, after the liquidation of Old Ithaca, the stock of New Ithaca was held by Merrill Lynch Interfunding, Inc., Venture Lending Associates, L.P., General Electric Pension Trust, Gregory B. Abbott, G. Christopher Abbott, and Nicholas Wehrmann.

On or before October 28, 1983, petitioner did not engage in negotiations with the persons selling Old Ithaca's stock with respect to a specific price for the items purchased and Old Ithaca and petitioner did not allocate a specific price to the items purchased. When purchasing a business, Merrill Lynch generally intends to hold the business as a going concern for a number of years, then sell the business as a going concern.

On the day of the merger, Old Ithaca had 17 manufacturing plants and warehouse facilities in North Carolina, South Carolina, and Georgia, a distribution facility in Arizona, an executive office and sales office in New York City, and sales representatives located in various areas of the United States. It employed a work force of approximately 5,153 hourly production employees and had an assembled staff of other than production employees of 212 individuals, consist-

ing of 17 executives, 153 other salaried employees, and 42 hourly office employees.

The business operations of Old Ithaca and Ithaca were identical and there was no interruption of business activity as a result of the sale and liquidation. After the sale and liquidation, the officers and management personnel of Ithaca were the same as those of Old Ithaca, with the exception of Mr. Abbott. The members of the board of directors of Ithaca were different from the members of the board of directors of Old Ithaca.

At the time of the merger, the economy was in a deep recession nationally. Unemployment in North Carolina in February 1983 reached a high of 11.4 percent. As a result of the unemployment trends in North Carolina, there were labor surpluses. Workers in the apparel industry are paid low wages and their educational requirements are minimal. Large numbers of the workers in the apparel industry are high school dropouts. Most of the workers, particularly the women, move in and out of the labor force with great frequency.

The hiring process for production workers starts with an application being submitted at one of Ithaca's plants. The application is screened by a designated person within that plant. If the applicant has the necessary qualifications, the applicant is called in for an interview. At the interview, the interviewer goes through the application with the applicant to make sure everything is correct and to see if anything needs to be added. A supervisor or department head then shows the applicant the operation for which he or she is applying. After viewing the operation, the applicant is brought back to the office and a job either will or will not be offered at that time.

The hiring process for a salaried employee also begins with an application being submitted, although the actual interview process is usually longer because generally more than one applicant will be interviewed. The applicant will talk to the supervisor of the position applied for and generally those persons offered employment will have followup interviews scheduled, at which time an offer generally will be made. The hiring process for executives often involves the services of an executive recruiter, travel

expenses, and the interviewing of a number of applicants for one position.

During 1983, training was generally necessary for a production worker. Initially, the trainee would be familiarized with break times and lunch times and then taken to the area in which the trainee was going to work. Sometimes the supervisor did all of the training, but more often the training was done by a training operator or a training instructor. The trainer would show the trainee an experienced operator who did the work to be performed in a manner that was consistent with the method Ithaca wished to teach and the rapid pace Ithaca expected. The trainee would watch the experienced operator for some period of time and then would be introduced to his or her particular job.

The next step would be to give the trainee material scraps on which to sew until the trainee felt comfortable operating the sewing machine. The trainee then would be given garments to sew, generally in the beginning an easy size and an easy style. When the trainee began producing garments, the quality control operator would review and grade the garments and the supervisor would also review the work. As the trainee progressed, less and less time would be spent with the supervisor, training instructor, and quality control operator.

A production worker was considered trained when the worker met and maintained Ithaca's standard productivity for at least 2 or 3 weeks consecutively. Standard productivity levels are established by calculating how many garments each operator must produce in a given period of time for the company to operate at a profit after covering overhead costs. In making this determination the cost system for the product and the maximum production capability of an operator are considered. The costs incurred by petitioner in the hiring and training of its work force were deducted as business expenses.

Ithaca entered into contracts with hosiery and other retailers to supply them with a stated quantity of garments over a stated period. In anticipation of meeting these contract requirements, Ithaca entered into long-term contracts to purchase raw materials used in manufacturing the

garments. In general, each raw material supply contract is evidenced by a written purchase order and a sales contract. The purchase order is prepared by Ithaca's director of purchasing at or about the time the director reaches a verbal agreement with a supplier regarding the terms of a supply contract. The sales contract is a document containing identical terms to the purchase order. It is generally prepared by the supplier and signed by both parties. Either party might suggest a change in one or more terms of a supply contract, and the supply contract would be altered if both parties agreed to such alteration. The delivery dates were chosen by Ithaca and were occasionally modified.

The process of negotiating prices of yarn for yarn supply contracts includes obtaining price quotations over the telephone from a variety of suppliers and checking with suppliers who made acceptable quotations as to the availability of the volume of yarn desired by Ithaca. Some of the factors affecting the pricing of both 100-percent cotton and cotton/polyester-blend yarns include the following: Price movement on the cotton commodity futures market, the delivery dates desired (relative to the available supply of cotton and yarn), the volume to be purchased, supply and demand, and the type and quality of yarn to be purchased. The cotton market is very volatile and the price is influenced by fluctuations in the cotton commodity futures market. The price of synthetic cotton-blend yarn fluctuates with the price of both cotton and polyester. Supplier's yarn prices are competitive. Large yarn customers such as Ithaca, with volume business, have more leverage and can negotiate more favorable prices than smaller customers.

If Ithaca needs an additional supply of the type of yarn covered by a supply contract that has been completed, Ithaca's director of purchasing will enter into a new series of price negotiations with a variety of suppliers. Old Ithaca and Ithaca generally requested and negotiated "far out" delivery dates of 1 year or longer.

Mr. Ed Mohn was director of purchasing of both Old Ithaca and Ithaca. The director of purchasing purchases cotton and cotton/polyester-blend yarns and oversees the timely delivery of the yarns against raw material supply contracts which have been entered into. As a matter of

business routine, Mr. Mohn also kept copies of all purchase orders and sales contracts, receiving records, and correspondence relating to such documents.

Inside Textiles is a textiles market newsletter published every 2 weeks. Among other things, the newsletter presents market price ranges for a number of fibers and cotton and cotton/polyester-blend yarns. These ranges are derived from quotations which the editor solicits from a variety of sources in the industry, including sellers and purchasers of yarn. Inside Textiles contains market price ranges for several types of yarns which are covered by Ithaca's raw material supply contracts. The published yarn prices are yarn prices from the preceding 2 weeks.

As of the merger date, petitioner had entered into supply contracts with various suppliers or agents that were in various stages of completion and had delivery dates extending past the merger date. The contracts terminated by their terms on various dates, the latest of which was approximately 14 months after October 28, 1983. None of the raw material contracts, by their express terms, could be assigned without the consent of the supplier. Deliveries of the yarn covered by contract numbers 3743, 7965, 7992, 6591, 6592, 4511, 033176, C889, C1228, 11488-7, 442, 2172 (Jaman yarns), 2172 (Rowann Mills), 9040, 2748, 8495, 8498, and 8496 were not completed on the merger date. These contracts all show a cost per pound for yarn to be delivered over the remaining term of the contract.

Mr. Ed Mohn for petitioner kept in its record some notations of market prices for yarn. The next week's prices shown in Inside Textiles were substantially the same as the notations of market prices kept by Mr. Ed Mohn. Petitioner purchased yarn in such large quantities that it generally obtained its yarn at a lower price than either the market prices shown in Inside Textiles or the market prices shown in its own records kept by Mr. Ed Mohn. On one contract with respect to cotton yarn 18.1, the price obtained by Ithaca was 6 cents per pound less than the mid-range of the contemporaneous listings quoted by Inside Textiles.

Separate receiving records are maintained by petitioner's personnel with respect to shipments made under each supply contract. These records show the date of each

delivery and the supply contract balance left to be delivered after subtracting the amount received by Ithaca as of that date. From the receiving records for most of the supply contracts, it is possible to ascertain the remaining balance of a supply contract as of the merger date.

Several months prior to the merger date, the American Appraisal Co. (AAC) appraised the assets of Old Ithaca. The appraisal was used by petitioner to provide a valuation for bank lenders and to determine an allocation of basis for tax purposes. The allocation of basis was as follows:

| Allocation | Amount |
|---|---|
| Cash | $1,722,000 |
| Accounts receivable | 22,138,000 |
| Inventory | 39,108,000 |
| Prepaid expense | 765,000 |
| Fixed assets | 62,722,000 |
| Patents | 11,860,000 |
| Raw material contracts | 1,760,000 |
| New York office lease | 165,000 |
| Work force in place | 7,700,000 |
| Deferred debt expense | 2,750,000 |
| Goodwill | 3,845,000 |
| Other | 508,000 |
| Investment in subsidiary | 5,092,000 |
| Basis in assets acquired | 160,135,000 |

The amount allocated by petitioner to goodwill was determined under the residual method. Under the residual method, goodwill is equal to the excess of the basis over the aggregate fair market value of the identifiable tangible and intangible assets.

On the basis of AAC's allocation of $7,700,000 to the work force in place, petitioner assigned an average per capita amount to each of its hourly and production work force and staff employees and amortized that amount when that person's employment relationship terminated. Accordingly, petitioner claimed deductions for amortization of assembled staff and work force in the amounts of $674,104 and $1,884,422 for the fiscal years ending February 3, 1984, and February 1, 1985, respectively.

On its returns petitioner allocated a basis to 26 raw material supply contracts in the total amount of $1,760,000, with the value of each contract allocated over the term of the contract. Petitioner amortized the value of each raw

material supply contract over its remaining term. Petitioner claimed amortization deductions with respect to the raw material contracts in the amounts of $495,440 and $1,264,560 for the fiscal years ending February 3, 1984, and February 1, 1985, respectively.

In his notice of deficiency, respondent disallowed the deductions claimed for amortization of the work force in place in the amounts of $674,104 and $1,884,422 for the fiscal years ending February 3, 1984, and February 1, 1985, respectively, with the explanation that the amount of purchase price allocated to the work force in place is part of going-concern value and not properly amortizable. Respondent also disallowed the deductions claimed for amortization of raw material contracts in the amounts of $495,440 and $1,264,560 for the fiscal years ending February 3, 1984, and February 1, 1985, respectively, with the explanation that the amount of the purchase price allocated by petitioner to the raw material contracts is part of goodwill or going-concern value and not properly amortizable.

## OPINION

### Assembled Work Force

Section 167(a) allows as a deduction for depreciation a reasonable allowance for the exhaustion and wear and tear of property used in a trade or business or of property held for the production of income. The term "property" includes intangibles. *Citizens & Southern Corp. v. Commissioner*, 91 T.C. 463, 479 (1988), affd. without published opinion 900 F.2d 266 (11th Cir. 1990). Section 1.167(a)-3, Income Tax Regs., provides that an intangible asset may be amortized if the—

intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy * * * .

No deduction for depreciation is allowable with respect to goodwill or going-concern value since neither has an ascertainable useful life. Sec. 1.167(a)-3, Income Tax Regs.; *United States v. Cornish*, 348 F.2d 175 (9th Cir. 1965).

To depreciate an intangible asset, a taxpayer must demonstrate that the asset has a limited useful life, the duration of which can be estimated with reasonable accuracy, and an ascertainable value separate and distinct from goodwill or going-concern value. *Southern Bancorporation, Inc. v. Commissioner,* 847 F.2d 131, 136-137 (4th Cir. 1988), affirming a Memorandum Opinion of this Court; *Houston Chronicle Publishing Co. v. United States,* 481 F.2d 1240, 1250 (5th Cir. 1973); *Citizens & Southern Corp. v. Commissioner, supra* at 479.

Petitioner contends that the assembled work force is an asset separate and distinct from goodwill or going-concern value and that this asset has an ascertainable limited useful life. Petitioner concludes that the replacement cost method can be used to value the assembled work force and that when valued on this basis no part of the value of this assembled work force is an integral part of going-concern value. Respondent contends that an assembled work force represents the value inherent in having a trained staff of employees in place, enabling the business to continue without interruption, and is going-concern value. Respondent argues that, because going-concern value is not a depreciable asset, petitioner is not entitled to a deduction for amortization of the assembled work force.

Respondent contends that, as a matter of law, the value of an assembled work force represents going-concern value. Petitioner argues that the determination of whether the assembled work force is an intangible asset with an ascertainable useful life and value and, therefore, subject to amortization, is a question of fact. Although it has been consistently held that no deduction for amortization is allowable for goodwill and going-concern value, section 1.167(a)-3, Income Tax Regs.; *United States v. Cornish, supra,* it also has been consistently held that the determination of whether an intangible asset is part of goodwill or going-concern value is a question of fact. *Houston Chronicle Publishing Co. v. United States, supra* at 1245-1251; *Citizens & Southern Corp. v. Commissioner, supra* at 479. Accordingly, whether the assembled work force is an intangible asset with an ascertainable value and a limited

useful life separate from goodwill or going-concern value is a question of fact.

Going-concern value is "the additional element of value which attaches to property by reason of its existence as an integral part of a going concern." *VGS Corp. v. Commissioner,* 68 T.C. 563, 591 (1977). It is characterized by the ability of an acquired business to continue to operate and generate income without interruption during and after acquisition. *UFE, Inc. v. Commissioner,* 92 T.C. 1314, 1323 (1989); *Solitron Devices, Inc. v. Commissioner,* 80 T.C. 1, 19-20 (1983), affd. without published opinion 744 F.2d 95 (11th Cir. 1984); *VGS Corp v. Commissioner, supra* at 592; *Computing & Software, Inc. v. Commissioner,* 64 T.C. 223, 235 (1975). While goodwill and going-concern value are often referred to conjunctively, technically going-concern value is the ability of a business to generate income without interruption, even though there has been a change in ownership; and goodwill is a "preexisting" business relationship, based on a continuous course of dealing, which may be expected to continue indefinitely. *Computing & Software, Inc. v. Commissioner, supra* at 232. See also *Winn-Dixie Montgomery, Inc. v. United States,* 444 F.2d 677, 685 (5th Cir. 1971).

Prior case law supports a conclusion that, because an assembled work force is necessary to allow the business to operate and generate income without interruption during and after acquisition, such assembled work force generally is not an asset that is separate and distinct from going-concern value.

In *First Pennsylvania Banking & Trust Co. v. Commissioner,* 56 T.C. 677, 690 (1971), when discussing the amount of the amortization deduction to which the taxpayer was entitled with respect to a mortgage servicing business it had purchased, we stated:

> We note that the agreement did not (and obviously could not) state that Clarke's employees were bound over to Penn, but this does not detract from the *probability* that the employees would join petitioner's operation and that this factor formed a part of the going-concern value which was purchased. * * *

Under the facts in *First Pennsylvania Banking & Trust Co. v. Commissioner, supra,* when the directors and stockhold-

ers of W.A. Clarke Mortgage Co. (Clarke), which serviced mortgage loans for various institutions, decided to liquidate and dissolve the corporation, First Pennsylvania Banking & Trust Co. (Penn), became interested in acquiring from Clarke the right to service a major portion of the mortgage loans Clarke was servicing. Penn had no mortgage service department of its own, but it anticipated starting up such a department by employing a large portion of Clarke's staff and acquiring Clarke's furniture and fixtures. In its negotiations with the lending institutions, Penn represented that it expected to employ Clarke's personnel to do the servicing. Subsequently Clarke entered into an agreement of sale with Penn.

The issue before this Court was the amount of the purchase price of Clarke with respect to which Penn was entitled to amortization deductions. Respondent argued that, although Penn was entitled to amortization deductions for the right to receive servicing fees, Penn had also purchased intangible assets from its predecessor such as the right to service future loans and Clarke's goodwill and going-concern value.

Before the transaction, Clarke originated loans for various lenders and also serviced loans which in many cases it had originated. Penn hired most of Clarke's employees, serviced loans formerly serviced by Clarke, serviced future loans of some of Clarke's customers, had full use of the escrow funds associated with all loans, and was in possession of Clarke's records and information on servicing loans. From the outset, Penn knew that it would employ Clarke's personnel and take over the files and equipment, thus benefiting from Clarke's experience and know-how. The personnel were expected to and did continue to perform the same duties and services as they had for Clarke. We found in *First Pennsylvania Banking & Trust Co. v. Commissioner, supra* at 690, that a portion of what was paid for the right to service the existing loans and the right to use the escrow amounts associated therewith were amortizable and the remaining portion of the purchase price paid was allocable to goodwill or going-concern value, nonamortizable intangible assets.

In *Computing & Software, Inc. v. Commissioner, supra,* Computing & Software, Inc., acquired substantially all the properties, assets, and liabilities of Consumer Credit Clearance and the assets, including the credit information files, goodwill, and trade names, of Retail Merchants Credit Association and of Credit Bureau of Compton and Lynwood. Consumer Credit Clearance, Retail Merchants Credit Association, and Credit Bureau of Compton and Lynwood operated credit information services.

One of the issues before this Court was whether the credit information files were subject to depreciation. We found that the taxpayer had satisfied its burden of proof and established that the credit files purchased were separate and distinct from the goodwill of the companies purchased because the credit information had value for only a limited period. However, we found that in addition to credit information files, goodwill and going-concern value had been purchased. In concluding that going-concern had been purchased, we listed factors which demonstrated that the taxpayer could continue to provide services to customers of the acquired business without interruption because of a takeover. These factors included:

—an organization that was doing business and earning money; a network of customers and the expectation that their patronage would continue; a staff of employees trained in working with the credit files and dealing with the organization's customers; an established routine for supplying available credit information and obtaining and recording new data from various sources; and an established routine for recording the fees charged for credit-reporting services and billing the customers. * * * [*Computing & Software, Inc. v. Commissioner, supra* at 235.]

The portion of the price attributed to the above-listed factors was found to be nondepreciable.

Petitioner's contention with respect to its work force is conceptually similar to that in the cases discussed above. The existence of a trained and operational staff allowed Ithaca to step into the shoes of Old Ithaca. Ithaca acquired an organization that was doing business and earning money, had a staff of employees trained in operating sewing machines, working with fabrics, etc., and had an established routine for preparing garments. While the employees of Old Ithaca were not bound over to Ithaca, this fact does not

detract from the probability that the employees would join Ithaca's operation. Therefore, the assembled work force represents going-concern value, which has been regarded as not having an ascertainable useful life.

Generally an asset has been regarded as an asset distinct from goodwill and going-concern value where the evidence shows such asset to be a wasting asset with a reasonably ascertainable useful life and value. An asset is subject to amortization only if it is a wasting asset. *Richard S. Miller & Sons, Inc. v. United States,* 210 Ct. Cl. 431, 537 F.2d 446, 452 (1976). Depreciation is intended to reflect the loss in value of an asset used to produce income and to make a meaningful allocation of the cost to the tax period benefited by the use of the asset. *Massey Motors, Inc. v. United States,* 364 U.S. 92 (1960). The Eighth Circuit Court of Appeals, in discussing the theory of depreciation, stated—

This allowance for depreciation is intended to provide a nontaxable fund to restore income-producing assets at the end of their useful life and their capacity to produce income has ceased or, to allow a taxpayer to recoup his investment in wasting assets free of income tax. * * * [*Northern Natural Gas Co. v. United States,* 470 F.2d 1107, 1109 (8th Cir. 1973).]

In this case, it is "the assembled work force" that petitioner claims is a wasting asset, not each individual worker. Although the assembled work force is used to produce income, this record fails to show that its value diminishes as a result of the passing of time or through use. As an employee terminated his or her employment, another would be hired and trained to take his or her place. While the assembled work force might be subject to temporary attrition as well as expansion through departure of some employees and the hiring of others, it would not be depleted due to the passage of time or as a result of use. The turnover rate of employees represents merely the ebb and flow of a continuing work force. An employee's leaving does not interrupt or destroy the continued existence of the whole. To the extent the leaving of any employee reduces the value of the assembled work force as a whole this value would be restored by the hiring of a new employee. The whole of the assembled work force is equal to the sum of its employees, but each employee enjoys no separate capital standing independent of the whole. See generally *Golden*

*State Towel & Linen Service, Ltd. v. United States,* 179 Ct. Cl. 300 (1967); *Thrifticheck Service Corp v. Commissioner,* 33 T.C. 1038, 1047 (1960), affd. 287 F.2d 1 (2d Cir. 1961). Because the assembled work force does not diminish in value as a result of the passage of time or through use, there is no loss in value that must be allocated to the tax period benefited by the use of the assembled work force.

The cases relied on by petitioner, such as *Citizens & Southern Corp. v. Commissioner,* 91 T.C. 463, 479 (1988), affd. without published opinion 900 F.2d 266 (11th Cir. 1990), *Houston Chronicle Publishing Co. v. United States,* 481 F.2d 1240 (5th Cir. 1973), and *First Pennsylvania Banking & Trust Co. v. Commissioner,* 56 T.C. 677 (1971), where the addition of new deposit accounts or customers or service contracts obtained by the taxpayer were held not to replace the ones purchased by the taxpayer which were lost through the years, are factually distinguishable from the present case. The assets involved in those cases are very different from an assembled work force. In the situations involved in those cases the taxpayer would attempt to obtain as many new customers, contracts, or deposit accounts as possible since those accounts would mean growth of the business. If new accounts had to be used in replacing an account taken over from another concern that had been lost, this growth might not occur, but the obtaining of new accounts, customers, or contracts was in no way limited to replacing ones taken over from a predecessor which were lost. Here, absent a growth in the petitioner's business or change in that business which was not shown to have occurred, petitioner's work force was stationary and replacements were made only when there was a person who resigned, retired, or was fired. Therefore, the replacement did replace the person lost rather than being an addition or increase. Except when losing a worker, petitioner would not hire a new worker. Therefore the work force as such did not diminish as did a group of deposit accounts, service contracts, or subscriber lists. The work force continued with only necessary replacements. The necessary replacements did not form a separate asset of petitioner as did the subscribers, service contracts, or bank deposit accounts obtained by a taxpayer through its own

efforts. The obtaining of new subscribers, customers, contracts, or deposit accounts might well represent growth of the taxpayer's business rather than replacing a diminishing asset. We conclude from the facts here present that petitioner's assembled work force was not a wasting asset.

If the asset is not a wasting asset, the taxpayer must wait until he sells the business to recover any gain or loss inhering in that asset. *Misegades v. Commissioner,* 53 T.C. 477 (1969). In *Misegades* the taxpayer purchased a patent law practice. We held that it was customary for retiring patent attorneys and the estate of a deceased patent attorney to sell the patent law practice. In finding that the taxpayer had purchased an intangible asset in the nature of goodwill which had no ascertainable useful life, we stated that—

at whatever time petitioner retired, or should he continue in practice until his death, at the time of his death the intangible asset composed of the patent law practice which he purchased might have a value equal to or in excess of the amount petitioner paid for the asset. Therefore, there is nothing in this record to indicate that an amortization or depreciation deduction should be allowed with respect to the $45,000 over petitioner's life expectancy. \* \* \* [*Misegades v. Commissioner, supra* at 486.]

The assembled work force, just as the patent law practice involved in *Misegades*, is not a wasting asset. The assembled work force would be included in any sale of the entire business by petitioner as it was in petitioner's purchase of the assets of Old Ithaca and at the time of such a sale petitioner would realize any gain or loss with respect to the assembled work force.

Petitioner argues that it has shown that there is a limited useful life of the assembled work force separate and distinct from going-concern value and, therefore, has shown that it is an asset separate from goodwill or going-concern value. A taxpayer may establish the useful life of an asset for purposes of depreciation based on his own experience with similar property or, if his own experience is inadequate, based on the general experience of the industry. Sec. 1.167(a)-1(b), Income Tax Regs. Mathematical or absolute accuracy is not required when estimating the life of a depreciable asset. A rough estimate or reasonable approximation is sufficient. *Burnet v. Niagara Falls Brewing Co.,*

282 U.S. 648, 654-655 (1931); *Super Food Services, Inc. v. United States,* 416 F.2d 1236, 1238 (7th Cir. 1969); *Citizens & Southern Corp. v. Commissioner,* 91 T.C. 463, 500 (1988), affd. without published opinion 900 F.2d 266 (11th Cir. 1990). The useful life must be based on facts existing as of the close of the taxable year in issue. *Southern Bancorporation, Inc. v. Commissioner,* 847 F.2d 131, 137 (4th Cir. 1988), affirming a Memorandum Opinion of this Court; *Citizens & Southern Corp. v. Commissioner, supra* at 500. Evidence of a taxpayer's subsequent experience is acceptable to corroborate its projections based on prior experience. *Citizens & Southern Corp. v. Commissioner, supra* at 500.

Petitioner argues, first, that the life of the work force is limited because employees will terminate their employment with petitioner. The termination will be either voluntary, involuntary, or as a result of death. Petitioner argues that the fact that the employment relationship will terminate at the latest upon the death of the employee establishes a limited useful life for the assembled work force under the holding of *Newark Morning Ledger Co. v. United States,* 734 F. Supp. 176 (D.N.J. 1990).

In *Newark Morning Ledger Co. v. United States, supra,* a predecessor to Newark Morning Ledger Co., Herald Co., purchased all the outstanding stock of Booth Newspapers. Booth Newspapers published a number of paid-circulation newspapers. A paid-circulation newspaper is one where the newspaper is sold to the readers. Herald Co. claimed depreciation deductions for the paid-circulation subscribers of the newspapers that it acquired. The issue before the court was whether the acquisition of existing paying subscribers was an amortizable intangible asset separate and apart from goodwill.

The facts in *Newark Morning Ledger Co. v. United States, supra* at 176, are distinguishable from the facts in the present case since it is the work force in place that petitioner contends is the separate asset in the instant case. This fact distinguishes this case from *Newark Morning Ledger Co. v. United States, supra,* as it does from the other cases relied on by petitioner in valuing customers or subscribers. In the case of accounts, customers, or subscriptions, the new account, customer, or subscriber obtained is

not necessarily related to the discontinuing of the old and the taxpayer would prefer to keep both. In the instant case only when an employee leaves is he or she replaced so that there is no change nor is there intended to be a change in the assembled work force. The training of the new employee to keep the assembled work force unchanged is a deductible expense.

Petitioner contends that our holding in *Citizens & Southern Corp. v. Commissioner, supra*, supports its argument that the assembled work force has a limited useful life. The taxpayer in *Citizens & Southern Corp. v. Commissioner, supra*, acquired nine banks and allocated a portion of the purchase price to an identified deposit base as a separately defined intangible asset. The deposit base had a value equal to the present value of the future stream of income to be derived from employing the purchased core deposits of a bank. The taxpayer proved that the deposit base had an ascertainable cost basis separate and distinct from the goodwill and going-concern value of the acquired banks and that it had a limited useful life, the duration of which could be ascertained with reasonable accuracy. We held that the taxpayer was entitled to allocate to the deposit base an amount equal to the present value of the difference in cost between the acquired core deposits and the market alternative.

The facts in this case are distinguishable from *Citizens & Southern Corp. v. Commissioner, supra.* In *Citizens & Southern* this Court made a factual determination that the core deposits at issue did not possess any characteristics of goodwill. On the facts in this case, we conclude that the assembled work force is not an asset that is separate and distinct from going-concern value since it is not a wasting asset.

Petitioner relies on the analysis of a Dr. Doerfler, whom it engaged to conduct a lifing analysis of the assembled work force in place on the date of the merger to support its argument that the assembled work force has a limited useful life which can be measured with reasonable accuracy. Specifically, Dr. Doerfler was engaged to determine the rate at which workers employed by Ithaca on the date of the merger could be expected to terminate employment follow-

ing the acquisition. Dr. Doerfler determined that the average useful life of the aggregate assembled work force was approximately 6.8 years and summarized how 5,149 employees would be expected to terminate over the subsequent years. Respondent objects to the statistical method used by Dr. Doerfler. However, we need not decide whether this statistical method is appropriate since we do not agree that such statistical method is an accurate measure of the useful life of the assembled work force. Dr. Doerfler has attempted to determine the useful life of the individuals who make up the work force on the day of the merger, not the length of time the work force as an assembled entity will exist in the hands of the corporation. As noted above, each employee is not a separate asset independent of the whole as would be the situation under petitioner's theory. The rate at which the individual employees who make up the work force on a specific day will leave their jobs is not a determination of the length of time an assembled work force as an entity will be an intangible asset of the business. This is evidenced by the fact that, while individual employees that make up the assembled work force on a specific date may leave the work force at a predictable rate, the work force as an assembled entity does not diminish by reason of the employees leaving. If the useful life of the employees employed on the date of the merger were the same as the useful life of the assembled work force, at the end of 6.8 years petitioner would no longer have an assembled work force. Clearly, this is not the case.

Accordingly, we hold that the assembled work force is not separate and distinct from going-concern value and, because it is not a depreciable asset, that amortization deductions claimed by petitioner are not allowable.

*Raw Material Contracts*

Under section 167(a) and section 1.167(a)-3, Income Tax Regs., a contract which has a limited life and is utilized in the business of a taxpayer may be amortized ratably over its useful life. *Triangle Publications, Inc. v. Commissioner,* 54 T.C. 138, 147 (1970). In order to show that a contract is amortizable, a taxpayer must establish that the contract has a limited useful life, the duration of which can be

estimated with reasonable accuracy, and an ascertainable value separate and distinct from goodwill and going-concern value. *Southern Bancorporation, Inc. v. Commissioner*, 847 F.2d 131, 136-137 (4th Cir. 1988), affirming a Memorandum Opinion of this Court; *Houston Chronicle Publishing Co. v. United States*, 481 F.2d 1240, 1250 (5th Cir. 1973); *Citizens & Southern Corp. v. Commissioner*, 91 T.C. at 479.

Petitioner argues that the contracts are separate and distinct from going-concern value. Respondent argues that the favorableness of the contracts does not constitute an asset that is separate and distinct from going-concern value because a supply of yarn is essential for the business operations of Ithaca to continue without interruption. Respondent contends that the contracts represent favorable business factors and as such are part of going-concern value.

Respondent states that *VGS Corp. v. Commissioner*, 68 T.C. 563 (1977), supports his contention. In *VGS Corp.* a predecessor of VGS Corp. acquired all of the stock of another corporation and certain assets of a partnership. No allocation of the purchase price was made to supply contracts held by one of the acquired companies. No allocation was made to the contracts because no competitive advantage was gained from them, not because they were considered to be part of going-concern value. We conclude that our holding in *VGS Corp. v. Commissioner, supra*, does not support respondent's contention.

We do not agree with respondent that the fact that a supply of yarn is essential for petitioner's business operations requires the characterization of the yarn contracts asset as goodwill or going-concern value. Certain equipment may be essential for business operations, but the equipment may also be a depreciable asset, separate and distinct from going-concern value. While raw material is necessary to enable Ithaca to continue its business, contracts for acquisition of the raw material at a specified price are assets that are separate and distinct from going-concern value. See *Triangle Publications, Inc. v. Commissioner*, 54 T.C. 138 (1970); *Hoffman v. Commissioner*, 48 T.C. 176 (1967).

Petitioner argues that the contracts had a useful life of 14 months. Respondent argues that the contracts did not have

a limited useful life. While the useful life of an asset must be based on the facts as they exist at the close of the taxable year in issue, *Southern Bancorporation, Inc. v. Commissioner, supra; Citizens & Southern Corp. v. Commissioner,* 91 T.C. 463, 500 (1988), affd. without published opinion 900 F.2d 266 (11th Cir. 1990), a taxpayer may establish the useful life of an asset based on its own experience with similar property. Sec. 1.167(a)-1(b), Income Tax Regs.

Respondent argues that the life of the contracts is indefinite because any value inhering in the contracts exists only so long as the favorable price spread is predicted to exist. Respondent argues that because yarn prices fluctuate, it is impossible to predict with any accuracy the length of time the spread would exist. We find this argument unpersuasive. The favorable spread of the contracts is not the asset being amortized. The asset is the contracts themselves. The favorable spread is used only to determine the value of the contracts.

Respondent argues that the contracts are indefinite in length because the existing contracts would be replaced with new contracts with the same suppliers and therefore were regenerative. Where a contract is renewable indefinitely as a matter of course it generally will be considered as having an indefinite life and therefore not subject to amortization under section 167. *Triangle Publications, Inc. v. Commissioner,* 54 T.C. 138, 147 (1970). The probability of future renewals is a question of fact. *Toledo TV Cable Co. v. Commissioner,* 55 T.C. 1107, 1117 (1971), affd. 483 F.2d 1398 (9th Cir. 1973); *Westinghouse Broadcasting Co. v. Commissioner,* 36 T.C. 912, 921 (1961), affd. 309 F.2d 279 (3d Cir. 1962). The contracts here in issue were not renewable as a matter of course. The cotton and polyester markets were very volatile. While new contracts might or might not be negotiated by petitioner with the same supplier, neither the purchaser nor the supplier would be willing to enter into a contract that was automatically renewable or consider any contract as automatically renewable with prices as volatile as those of the yarn market. The record here supports petitioner's contention that the yarn contracts were not automatically renewed. Petitioner pre-

sented convincing evidence that all contracts were entered into only after negotiations. Each contract would contain its own quantity to be delivered, delivery schedule, type and quality of yarn, and price. The price that could be obtained would depend on the amount Ithaca intended to order, the supply and demand of the market in general, the time of year Ithaca was placing its order, the time between placing the order and delivery, and sometimes the price of polyester. Each contract here involved is separate and distinct from a predecessor contract even when the parties are the same. The fact that old contracts which are not by their terms renewable may be replaced with new contracts does not make the life of the old contracts indefinite or regenerative. See *Commissioner v. Seaboard Finance Co.,* 367 F.2d 646 (9th Cir. 1966), affg. a Memorandum Opinion of this Court.

Respondent next argues that the contracts are indefinite in length because the stated delivery or termination dates were occasionally changed. Because of the volume of yarn that Ithaca purchased and the length of time from order to delivery, the parties contemplated a reasonable measure of flexibility in the delivery schedule of the yarn. This is evidenced by the fact that it was common for the delivery dates to be altered. However, since alteration was by mutual agreement of the parties, the provisions of the contracts were honored by both parties. The fact that the delivery schedule was altered to meet the needs of Ithaca and that final delivery was not always completed before the termination date stated on the contract does not cause the contracts to have an indefinite life. Petitioner need only establish a reasonable approximation of the useful life of an asset for purposes of depreciation. *Burnet v. Niagara Falls Brewing Co.,* 282 U.S. 648, 655 (1931). We find that a 14-month useful life for the yarn contracts as a whole is a reasonable approximation. Accordingly, we hold that the yarn contracts are an intangible asset properly amortizable over a 14-month period.

Respondent argues that the nonassignment clause in each contract destroys any favorableness because the seller would consent to an assignment only if the contracts were favorable to the supplier on the acquisition date. Generally

in a merger the surviving corporation succeeds to the rights of the old corporation by operation of law, not by assignment. Therefore, the nonassignability clause in the contract would not have prevented petitioner from enforcing its rights under the supply contracts following the merger. See *Econo-Travel Motor Hotel Corp. v. Taylor,* 301 N.C. 200, 271 S.E. 2d 54 (1980). The nonassignment clause in the contracts would of course have an effect on petitioner's ability to sell them, which would mean that the value of these contracts could not be reasonably determined on a sale basis. However, the nonassignment clause does not keep the contracts from having a value to petitioner. The contracts enable petitioner to obtain yarn at a price less than current market price. The nonassignment clause without the seller's consent affects the value of the contracts, but does not cause them to have no reasonably ascertainable value.

Petitioner measured the savings yielded by each supply contract by computing the difference between the price in the supply contract and the claimed market price for the same yarn as of the merger date. The savings were then computed for the remaining term of each supply contract by multiplying the favorable price differential by the pounds to be delivered in each month. The present value of the total savings per month was determined using an 11.99-percent discount rate. Those savings were then tax-effected at a rate of 48 percent and the amortization benefit factored in.

Respondent, through his expert witness Mr. Kim, computed the value of the contracts (as an alternative to claiming that no value could reasonably be computed) by using a lesser market price and a 15-percent discount rate and eliminating contracts which showed no deliveries after the merger date or that had been completed prior to the merger date. Petitioner in appendix III to its brief followed respondent's system except that petitioner used the same market price for yarn that had been used in its prior compilations. On the basis of this compilation, which petitioner stated was the "value of raw material contracts using Mr. Kim's formula," petitioner arrived at a fair market value of the contracts of $951,353. After reviewing all of the evidence in this case and considering the opinions

as to the value of the yarn contracts as of the date of the merger given by both petitioner's and respondent's expert witnesses, we conclude that the most reasonable method of valuing these contracts is the method as used in appendix III to petitioner's brief with the exception that the market price used by petitioner in the compilation is too high. Petitioner's compilation makes no adjustment for the fact that petitioner as a quantity purchaser was able to obtain a better price than the going market price used in the compilation. Neither the price from petitioner's own records nor the market prices from Inside Textiles adjusts for quantity purchases.

The testimony of respondent's witness shows with respect to at least one contract that the price obtained on the date of the merger or substantially close to that date by petitioner in a purchase of yarn was 6 cents per pound lower than the mean quoted market price of Inside Textiles and petitioner's own recorded market price. We conclude that some discount must be taken on the market price used by petitioner in making the compilation in order to determine the true value of the yarn contracts considering prices petitioner would have paid without the contracts. The current market prices used by petitioner for the various yarns ranged from a low of $1.73 to a high of $3.17. From the record in this case, we cannot determine a precise average price either on all cotton yarns or yarns with some polyester. However, we conclude based on the record as a whole that a reasonable discount on all the prices for the quantities in which petitioner purchased is 2.5 percent on the market price at the date of merger as used in appendix III attached to petitioner's brief. If in any instance this results in a market price below the contract price, that particular contract should be eliminated since from the testimony as a whole it appears to be unlikely that there were prices at the merger date in October 1983 that were lower than the contract prices for the same yarn. We, therefore, decide that a proper computation of the market value is the value as computed in appendix III to petitioner's brief after adjusting market prices as used in that compilation by reducing such prices by 2.5 percent but eliminating any contracts where no savings result. The

parties can make the computation of the value of the yarn contracts determined on this basis in connection with their recomputation under Rule 155.

*Decision will be entered under Rule 155.*

